Kork KELLEY and Mrs. Kork Kelley, Plaintiffs in Error,

v.

ESTATE OF L. H. WENTZ, Deceased (T. E. Prentice and M. P. Long, Executors of the Estate of L. H. Wentz, Deceased), Defendant in Error.

No. 37600.

Supreme Court of Oklahoma.

Dec. 24, 1957.

R. L. Stimpert, Raymond A. Trapp, Blackwell, for plaintiffs in error.

Felix Duvall, Ponca City, for defendant in error.

BLACKBIRD, Justice.

The controversy involved in this appeal concerns the title to, and certain financial obligations in connection with, a residence, whose legal description is: Lots 4 and 5, Block Three, of the Bungalow Heights Addition to Ponca City, Oklahoma.

Plaintiffs in error, Mr. and Mrs. Kork Kelley, purchased the lots in 1919, from a Mr. Eugene Wetzel, who then or later was connected with a Ponca City bank, under a contract of purchase, dated May 1st of that year, naming him as "seller" and referring to Mrs. Kelley as "buyer." The lots' purchase price was $540, payable $20 in cash at the time of the contract's execution, with the remainder to be thereafter paid in monthly installments of $10 each, the balance remaining unpaid after the first of the next year to draw interest at the rate of 6% per annum, payable annually. The contract was contained in a folder or booklet, referred to as a "payment book" and

provided a space for showing the various sums, and dates, of contract payments made by the buyer and the name or initials of the person issuing receipts to her therefor. The contract obliged the buyer to pay all taxes and special assessments accruing against the property after the year 1919, and further provided that when these and the purchase price had been fully paid, the seller would deliver to the buyer a warranty deed to the property. The contract gave the seller, in the event of the buyer's default in payment of the sums due under the contract, the option of declaring due and collectible the entire purchase price, or rescinding the contract and taking possession of the property and retaining, as rentals for occupation of the property, all payments theretofore made under it. The contract also provided that the buyer might build on the lots with the seller's consent, but that, if she did so without such consent, he might exercise the aforesaid option to accelerate the due date of the purchase price balance, or rescind the contract. The contract's "Eighth" paragraph authorized the buyer to "transfer" it before the lots were fully paid for, provided the seller's written consent thereto was endorsed thereon; and further provided that in the event of such transfer, or assignment, the last assignee would succeed to "all of the right, title and liabilities of the buyer" thereunder.

After the Kelleys commenced paying the contract's monthly installments on the aforesaid purchase price thereof, they constructed a home on the lots, but defaulted in payment of some of the materials used therein, which led to the commencement, by materialmen, of a court action to foreclose their liens. Mr. Wetzel became a party to the action; and, in the judgment entered therein during December, 1922, his claim for the sum of $503.87, allegedly due under the lots purchase contract, was established as a first lien on the property, with priority over the materialmen's liens, totally several times that amount, established and also ordered foreclosed in said judgment.

Thereafter, apparently to avoid the home being sold to satisfy these liens, Mrs. Kelley enlisted the aid of Lew or L. H. Wentz, by whom her husband was then employed as an engineer on the building of an expensive gasoline plant. The record herein contains no documentary evidence of the specific terms of the arrangements Mrs. Kelley then made with Wentz, but the evidence indicates that he must have agreed that if the Kelleys would begin paying him monthly payments such as were specified in the afore-described contract with Wetzel, he would satisfy all obligations due on the home in such manner and amounts as to protect their equity in the property and enable them, when Wentz was paid, to obtain legal title to the property and a deed evidencing it, as contemplated in the afore-described contract with Wetzel. For Wentz, the matter was to be looked after by a Mr. Merle or M. P. Long, who apparently held an executive post in the "land" or lease department of the Wentz office, or organization.

Thereafter, when the Wentz gasoline plant in whose construction Mr. Kelley had been employed, had been completed, and the Kelleys moved out of the home preparatory to leaving Ponca City, they rented it furnished, and Mrs. Kelley transmitted her aforesaid "payment book" to Merle Long, with the apparent understanding (in keeping with her agreement with Wentz) that the Wentz office would collect the rent, apply a portion of it to meeting the monthly payments on the lots under the contract with Wetzel, and use the remainder, or at least a portion thereof, to apply on the debt to Wentz, and in payment of the taxes and maintenance costs of the home.

Later, after Mr. Wetzel, through Long and the Wentz office, had been paid all that was due him under the lots purchase contract and the afore-described judgment, one W. H. England, a now long-deceased member of the Ponca City law firm of England & Duval, which then represented Wentz, apparently caused Wetzel, on July 10, 1923, to execute and deliver to Mr. Long, the

warranty deed to the lots that he had originally drafted for delivery to Mrs. Kelley, after erasing Mrs. Kelley's name as grantee and inserting Mr. Long's name in place of it. Wetzel testified he made this change in the conveyance on the basis of his "understanding" that it was satisfactory with all parties involved. On the same day, immediately following Mrs. Kelley's afore-described contract with Mr. Wetzel, there was executed on the "payment book" Mrs. Kelley had left with Long, a purported assignment of the contract by Mr. England's signing of Mrs. Kelley's name, "By" him. England signed Long's name to the "acceptance" of said "Assignment" appearing immediately below it; and written consent to the assignment (in accord with the provisions of the contract) was endorsed thereon by Wetzel. The deed was filed of record the next day.

Within little more than a month thereafter, Long and his wife executed a deed, dated August 13, 1923, to the property, naming Mr. Wentz as grantee thereof. This latter deed had never been filed of record when Long, almost two years later, or on October 22, 1925, wrote Mrs. Kelley, who then resided with her husband in Wichita Falls, Texas, a letter setting forth a partial statement, specifically itemized, of the debts against the property that Mr. Wentz had paid.

Later, on July 23, 1938, Long wrote Mrs. Kelley at Wichita Falls, as follows:

"I am enclosing herewith the statement of the receipts and expenses from the property at 324 South 12th Street since May 22, 1933. This statement carries this property up through May, 1938. Since that time we have collected rental of $30.00 in June and July, but the expenses, if any, have not been posted and I am not endeavoring to *chick* this back and make statement for fear I might miss something. You understand, of course, that the amount shown on these statements include interest at 6%. This interest is not compounded.

"The delay in sending this statement to you have been occasioned by sickness of Mr. Barrett, who was checking and typing it, and then by my absence from the office."

Thereafter, when in 1942, Mrs. Kelley made a trip back to Ponca City to see Wentz, thinking that the debts against the property had probably, by that time, been largely liquidated by the rentals therefrom, and desirous of borrowing $500 on it from him to help complete a daughter's schooling, Mrs. Kelley found he was not then in Oklahoma, but she saw Long, who offered to give her $50 for a deed to the property. About the same time, Long appears to have undertaken the curing of certain defects in the title to the property, as indicated by his writing of a letter to an out-of-state lending agency for a release of a certain mortgage which appeared of record. Also, his wife, who had never previously acknowledged her signature on the couple's aforementioned deed to Wentz, did so, on April 23, 1942.

About the 1st of November, 1948, a letter was written by one Earl Drake, or one of Wentz' other representatives, to Mrs. Kelley, who was then in Los Angeles, offering to pay her $200 for a quitclaim deed to the property. Two or three weeks later, Mr. and Mrs. Kelley mailed from Los Angeles, and caused to be filed in the Kay County Clerk's Office on November 22, 1948, an affidavit executed by them, to give public notice of their claim to the home's ownership. It was not until several days thereafter, that the aforesaid deed from Mr. and Mrs. Long to Wentz was filed of record in that office.

Wentz died in June, 1949, but not before Mrs. Kelley, according to her testimony, had made three different trips to Ponca City, after the above-mentioned one in 1942, on each of which occasions she made unsuccessful attempts to see him about the property. On at least one of these latter occasions, she was not permitted to see him because he was suffering from the illness which later caused his demise. On her last trip to Ponca City, Mrs. Kelley learned

from reading a newspaper of Wentz' death the day before. After his funeral, or on June 15, 1949, Mrs. Kelley went to the Wentz office and was allowed to see said office's file on the property. She testified that it was only then that she saw, and for the first time, was apprised of, the purported transfer or assignment to Merle Long of her purchase contract with Wetzel, and the deed originally made out to her by Wetzel, that had later had Long's name inserted therein in place of hers, as grantee. According to Mrs. Kelley's undisputed testimony, she then talked to Mr. Prentice, of the Wentz office, and he told her he thought the matter could be straightened out; and she and Prentice then conferred with Mr. Duval, who, since the death in 1923, of his law partner, the afore-named, W. H. England, has represented the Wentz interests. Mrs. Kelley testified Duval promised her a statement concerning the matter within 30 days thereafter, but later, when she didn't receive it, and went back to the Wentz office, Mr. Long told her he wasn't going to give her any such statement unless required to do so by court order.

In the fall of 1949, after the afore-named Prentice and Long had been appointed executors of Wentz' estate, an instrument in the nature of a claim against said estate was presented to them, executed by Mr. and Mrs. Kelley in Los Angeles, in which it was represented, in substance, that the home involved herein belonged to them and that Wentz had taken possession of it under an agreement that he would liquidate the indebtedness against it, collect the rentals therefrom, and apply them to his reimbursement, and when such reimbursement was completed, deed it to the Kelleys. It was alleged therein that the income from said property had "long since" satisfied Wentz' debt against it, but, "through oversight or neglect", no deed to the property had been executed and delivered to said claimants. The instrument, in effect, called upon those administering Wentz' estate, to convey the property to claimants, and pay them any income that had been derived from the property over and above the total amount necessary to liquidate such indebtedness.

After the executors of the Wentz estate had rejected, or disallowed, the above-described claim, the Kelleys, hereinafter usually referred to as plaintiffs, instituted the present action on April 25, 1950, against the Wentz estate, hereinafter usually referred to as defendant, to quiet their alleged title, and obtain possession of, the aforesaid property and to obtain an accounting of the rents, profits and expenses that had accrued in connection with its management under Mrs. Kelley's afore-mentioned agreement with Wentz. In connection with their prayer for the latter relief, plaintiffs made an offer to pay, or a tender of, whatever amount, if any, the funds expended by Wentz in managing the property exceeded the income therefrom, if such excess was proved to exist. On the other hand if the accounting established a balance in their favor, they asked for recovery of it.

In answering plaintiffs' petition for the defendant estate, its executors, Long and Prentice, denied generally the allegations therein contained, affirmatively alleged that the Wentz estate was the owner of the property, and further alleged that plaintiffs' claim to it was barred by both limitations and laches.

At the trial without a jury, plaintiffs introduced testimony and documentary evidence of the hereinbefore stated facts, among others, uncontradicted by any evidence on behalf of the defendant. The testimony of Merle P. Long, defendant's only witness, was of little, or no, value in supporting the alleged defenses. About the most material fact he testified to, was that he had nothing to do with the making of the arrangement between Mrs. Kelley and Mr. Wentz, and that it was a matter solely between them, of whose complete details he had no knowledge. He further testified that W. H. England was "our" (the Wentz organization's) attorney on the date of the purported assignment of Mrs. Kelley's lots

purchase contract with Wetzel; and he admitted having had dealings with England "in settlement of some of the claims" against the property, but disclaimed remembering any of the details of the transactions and testified that he had never noticed that England had signed his and Mrs. Kelley's names to the purported assignment, and its acceptance, and that Mrs. Kelley's name appeared to have been erased, to make room for his own on the deed from Wetzel, until these matters were called to his attention by Mrs. Kelley during examination of these documents after Wentz' death. Mr. Long made no claim that he had ever actually owned the property, or paid anything for it, and specifically testified that it was Wentz' money, rather than any of his, that was expended on it. Long was never questioned concerning the Kelleys' testimony that efforts had been made on behalf of him and/or Wentz, to obtain a deed from them to the property.

After all of the evidence was in and both sides had rested, the trial court took the case under advisement upon submission of briefs by the attorneys. Thereafter, he rendered a general judgment in favor of the defendant estate, decreeing that plaintiffs had "no right or interest" in the property, denying them any relief whatsoever, and taxing the costs of the action against them.

After the overruling of their motion for a new trial, plaintiffs perfected the present appeal.

Plaintiffs' arguments of error are presented under four propositions, but, as defendant's brief joins issue on no more than two of them—which we think present the only determinative questions in this appeal—the others will not be discussed.

Under their Proposition No. 1, plaintiffs argue that the trial court's judgment, holding, in effect, that the property belongs to the Wentz estate, is clearly contrary to the evidence which shows, without contradiction, that neither Mr. Wentz, nor his employee, Long, were ever the owners of the fee simple title thereto and that their only interest in the property was to preserve it for plaintiffs against sale, to satisfy the debts against it, and to secure Mrs. Kelley's obligation to Wentz for money he expended in satisfying those debts. They argue that if the record, or nominal, title being in Wentz has any efficacy whatsoever, it is akin, or somewhat analogous, to that of a mortgagee in possession holding a deed, rather than a mortgage, to secure the repayment to him of money he has loaned the true owner of the property therein described.

■ Defendant does not directly, or specifically, refute plaintiffs' argument, but seems to take the position, in a rather vague and general way, that there is enough evidence of what is referred to as plaintiffs' "abandonment" of the property, that the trial court's judgment against them cannot be said to be clearly against the weight of the evidence. We do not think that under the undisputed evidence of the circumstances surrounding plaintiffs' moving out of the property and departure from Ponca City and their residing away from there ever since, together with the abundant evidence that it was being looked after *for them* by the Wentz organization as their agent (at least until most real estate values had increased during the "inflation" period which began about the advent of World War II), that plaintiffs can be said to have abandoned the property.

■ Defendant relies more heavily on its Proposition 2, which, in substance, is that the evidence shows plaintiffs' claim of the property's ownership is barred by laches, or the five-year statute of limitations. 12 O.S.1951 § 93. In support of this argument, it relies upon two particular bits of Mrs. Kelley's testimony to show that she knew, as early as 1940, or '41, that Wentz was claiming the property adversely to her (despite the fact that the deed to Wentz from Long, though dated in 1923, was not recorded until November 17, 1949). One of these is an excerpt from Mrs. Kelley's direct examination in which, by way of de-

scribing what occurred on her trip to Ponca City, in 1942, in an effort to see Wentz, she related that Mr. Long, in Wentz' absence, wanted her to give a quit-claim deed to the property, and told her that "they" (apparently referring to the Wentz interests) could go into court and take the property like they had some others (apparently in the same addition). We do not think that if Long made such a statement, it could justifiably be interpreted as constituting, or supporting, a claim of adverse possession under the particular circumstances of this case. In view of the undisputed evidence that plaintiffs had, at that time, no actual notice of the existence of any kind of transfer, or conveyance, that could be set up as "color of title" upon which to base a claim of ownership adverse to theirs, the statement Mr. Long made, in the absence of Wentz, with whom, alone, Mrs. Kelley had the original agreement (and upon which she was warranted in relying, as controlling in the matter) might more reasonably have been interpreted by her as merely an effort to "drive a bargain" with her for the property's purchase.

The other bit of evidence, advanced in support of defendant's argument, is contained in the following excerpt from Mrs. Kelley's cross-examination, as follows:

"Q. All right, you say that Merle Long told you some time in '40 or '41 that the rents had paid off the debt? A. He said—he didn't say the rents had paid the debt, *but* he said that Mr. Wentz *had taken the property over* and taken it off of the books or something to that effect." (Emphasis ours.)

Under the facts of this case, we cannot construe the emphasized portion of the quoted testimony as giving plaintiffs notice of any claim by Wentz to ownership of the property. The same expression was used in the first letter Long wrote Mrs. Kelley in October, 1925, in which he gave her a statement of the claims against the property that Mr. Wentz had discharged, yet no one contends that when used on this prior occasion, the cited expression meant, or was

intended to mean, that Wentz had "taken over" the property *as his own* rather than as merely a trustee, manager, creditor, or agent of, or for, Mrs. Kelley. It is our opinion that neither of the statements relied on by defendant as starting the period of limitations, or laches, is sufficient for that purpose. In view of the fact that Mr. Wentz was a trusted employer of Mr. Kelley and that it was apparently because of such relationship and Wentz' well-known activities in financially aiding deserving persons, it is not surprising that the Kelleys had such patient and enduring confidence in his integrity through so many years. The record does not establish that Wentz, who had varied and extensive interests requiring the help of numerous employees and assistants for their operation and administration, ever actually knew that the record title to the subject property had been placed in his name; but, assuming that he did know about it, there is no direct evidence specifically showing the real reason this was done. However, under the circumstances, we think that neither the placing of the title in Long's name, apparently at the instance of the Wentz attorney, England, in connection with the settlement of the lien foreclosure action or satisfaction of the claims therein reduced to judgment, nor the purported conveyance from Long to Wentz, can be considered unequivocally incompatible with Wentz' position as trustee, agent or secured creditor of Mrs. Kelley. In this connection, see the Annotation, 54 A.L.R.2d 13. As hereinbefore noted, Long's testimony showed that he neither purchased, nor paid any of his own money for, the property; and no claim is made that the Long and Wentz deeds, and the purported assignment of the lots purchase contract, which Mrs. Kelley undoubtedly never signed (and was not claimed, or shown, to have authorized), were sufficient in themselves, either singly or collectively, without a period of adverse possession under them, to vest any legal or equitable title in Wentz. Nor is it claimed that the recording of the Long deed constituted notice to plaintiffs of any adverse claim to the

property. (As hereinbefore shown, the deed from the Longs to Wentz was not placed on public record until approximately 5 months before the present action was filed.) Nor is it claimed that the Kelleys' interest in the property was foreclosed, or extinguished, in favor of Wetzel in the afore-described lien foreclosure action, or that pursuant to an exercise by Wetzel of the option given him in the lots' sale contract, he had a right to, and did, treat the contract as rescinded, and conveyed to Long, in his own right, the full fee in the property, independently of the contract's unauthorized assignment to Long. As the purported assignment is apparently relied upon as a necessary link in defendant's chain of title to the property, and, under the undisputed evidence of this case, it was obviously invalid and insufficient as a transfer of any right, title or interest therein, and, in view of what we have already said, plaintiffs remain the owners of both the legal and equitable title to the property, it is now necessary only to place such title of record.

In accord with the foregoing, it is our opinion that the trial court erred in entering judgment for defendant. He should, as prayed for by plaintiffs, have required an accounting by defendant and determined the balance, if any, due it, or plaintiffs, on the basis thereof; and rendered judgment for plaintiffs, quieting their title in the property in accord with the undisputed evidence, conditioned only upon satisfactory assurance of consummation of their tender of any and all sums adjudged, after the accounting, to be due defendant from them.

The judgment appealed from herein is reversed and remanded to the trial court with instructions to vacate it and proceed as above indicated.

DAVISON, JOHNSON, WILLIAMS, JACKSON and CARLILE, JJ., concur.

HALLEY, J., concurs in result.

CORN, V. C. J., dissents.